
DA 08-0415

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 171

DOROTHY COBB for the Estate of LOWELL COBB,
and DOROTHY COBB, an Individual,

        Plaintiff and Appellant,

  v.

DOREEN SALTIEL, M.D.,

        Defendant and Appellee.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. CDV 05-562
Honorable Kenneth R. Neill, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

        James P. O'Brien, Attorney at Law, Missoula, Montana

        For Appellee:

        John D. Alexander and Cathy J. Lewis, Ugrin, Alexander, Zadick &
Higgins, Great Falls, Montana

Submitted on Briefs:  April 8, 2009

Decided:  May 19, 2009

Filed:

_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 Dorothy Cobb (Cobb) appeals from an order of the Eighth Judicial District Court, Cascade County, that granted summary judgment in favor of Doreen Saltiel, M.D. (Dr. Saltiel). We affirm.

¶2 Cobb presents the following issue on appeal:

¶3 *Whether Cobb timely filed her malpractice claim against Dr. Saltiel.*

## PROCEDURAL AND FACTUAL BACKGROUND

¶4 Lowell Cobb's (Lowell) internist referred him to Michael N. Murphy, M.D. (Dr. Murphy) for treatment of his hypertension and renal insufficiency. Lowell met with Dr. Murphy on November 12, 1999. Dr. Murphy noted that Lowell also suffered from Type 1 diabetes, hypothyroidism, peripheral vascular disease, and coronary artery disease. Lowell had not controlled many of these diseases properly over the years. Dr. Murphy started Lowell on dialysis for end-state renal disease secondary to diabetic nephropathy. Dr. Murphy later placed Lowell on a kidney transplant list.

¶5 Lowell complained to Dr. Murphy on November 29, 2000, of an episode of crushing chest pain. Dr. Murphy referred Lowell to Dr. Saltiel, a board-certified interventional cardiologist. Dr. Saltiel met with Lowell and Cobb on December 7, 2000. Dr. Saltiel performed a complete physical exam. She also recorded Lowell's medical and social history.

¶6 Dr. Saltiel determined that Lowell would be a good candidate for a cardiac catheterization. A cardiac catheterization would determine the condition of Lowell's

heart. Dr. Saltiel discussed the risks of the procedure with Lowell and Cobb. She explained that the risks included myocardial infarction, stroke, death, arrhythmia, bleeding, vascular compromise, and infection.

¶7 Cobb, Lowell's power of attorney, signed the consent for the procedure. Cobb testified in her deposition that she had a chance to read the consent and freely signed after having read it. Cobb later testified that she remained unaware, however, that the procedure involved risks.

¶8 Dr. Saltiel performed the cardiac catheterization on December 13, 2000. The procedure revealed that Lowell had considerable coronary artery disease in the left anterior descending artery. Dr. Saltiel estimated that Lowell's artery contained an 80% blockage.

¶9 Dr. Saltiel, after extensive discussion, informed Lowell and Cobb that she could perform either a rotational atherectomy with intracoronary stenting or a cardiac bypass graft. Dr. Saltiel proceeded with the rotational atherectomy and intracoronary stenting later that same day. Dr. Saltiel made certain that Brett Williams, M.D. (Dr. Williams), a heart surgeon, would be available to provide backup during the procedure. Dr. Saltiel informed Lowell and Cobb of Dr. Williams's availability.

¶10 Dr. Saltiel performed the procedure without incident until she attempted to deploy the second stent. The calcification in the artery required Dr. Saltiel to increase the balloon pressure. Dr. Saltiel successfully deployed the stent, but in doing so loose plaque perforated the left anterior descending artery. Dr. Saltiel immediately alerted Dr.

3

Williams of the need to perform a coronary bypass arterial graft. Dr. Saltiel informed Cobb about the perforation and the fact that she had called on Dr. Williams.

¶11 Lowell survived the surgery to repair the artery. Dr. Williams cared for Lowell after the surgery. Lowell initially stabilized, but he began to become agitated the next day. Lowell died at 9:20 p.m. on December 14, 2000. The autopsy confirmed that Lowell had died of a myocardial infarction.

¶12 The Montana Medical Legal Panel (MMLP) received Cobb's handwritten allegations on November 5, 2003. Cobb failed to submit a formal application or a consent form. MMLP could not access confidential health care records without these forms. MMLP requested that Cobb provide the appropriate consent forms in a letter to Cobb's counsel, James P. O'Brien (O'Brien), on November 6, 2003.

¶13 MMLP received a consent form from Cobb on November 19, 2003. The consent form did not include the patient's name or the names of the patient's health care providers. Cobb signed the consent form as the "patient/claimant" and did not explain her capacity in signing. MMLP sent a fax to O'Brien on November 24, 2003, in which it requested a formal application and identification of the health care providers who provided care for the patient. Cobb provided a partially completed application to MMLP on November 25, 2003. The partially completed application failed to designate the health care providers.

¶14 MMLP did not receive any additional information concerning Cobb's claim until MMLP wrote to O'Brien on March 12, 2004. MMLP once again asked O'Brien to

4

provide consent forms for the relevant health care providers. O'Brien called MMLP on March 22, 2004, to indicate that he had no idea that MMLP had been holding an incomplete claim. O'Brien claimed that he simply assumed that MMLP had been too busy to forward the claim.

¶15 MMLP received a consent form that addressed the records from only one of Lowell's health care providers on March 25, 2004. The consent form did not designate other health care providers who cared for the patient relative to the conduct alleged in the claim. MMLP called O'Brien on March 26, 2004, to ask for a complete listing of pertinent health care providers. MMLP received the full listing of Lowell's health care providers and consents to obtain access to the health care records on April 1, 2004. Cobb finally completed her claim at that point.

¶16 MMLP transmitted the claim to Dr. Saltiel on April 23, 2004. MMLP heard the claim and rendered a decision on August 12, 2004. MMLP mailed its decision to the parties on August 12, 2004. MMLP deemed service complete on August 18, 2004, to allow three business days for mailing and to account for an intervening weekend.

¶17 Cobb filed her suit against Dr. Saltiel on May 16, 2005. Dr. Saltiel responded by filing a motion for summary judgment. Dr. Saltiel argued that the three-year statute of limitations for medical malpractice claims in § 27-2-205, MCA, barred Cobb's claim. Dr. Saltiel pointed to several facts to support her motion. Cobb knew about the perforation when it happened and that the perforation required bypass surgery to repair it. Cobb admitted that she believed that the perforation constituted malpractice at the time of

Lowell's death. Cobb further admitted that she had contemplated a lawsuit within a month or two of Lowell's death. In fact, Cobb conceded that she had contacted a lawyer for the first time about a possible malpractice action in January or February of 2001. Cobb acknowledged that she learned nothing new from the time of Lowell's death until the time she first had contacted a lawyer about a possible malpractice action.

¶18 Cobb resisted Dr. Saltiel's motion on the grounds that Dr. Saltiel had failed to disclose to her acts, errors, and omissions. Cobb argued that Lowell's injuries "were well beyond the understanding of the lay person." She asserted that Dr. Saltiel's concealed acts were sufficiently material to her claim that the court should toll the statute of limitations. Cobb further alleged that Dr. Saltiel had continued to treat Lowell after his operation and had concealed this treatment. Cobb finally argued that Dr. Saltiel's extended absence from Montana prevented her from serving Dr. Saltiel with a summons and complaint. Cobb claimed that Dr. Saltiel's absence from Montana tolled the running of the statute of limitations.

¶19 The District Court rejected Cobb's claim that Dr. Saltiel fraudulently had concealed Lowell's injury. The District Court further determined that Cobb had "discovered" Lowell's injury at the time of his death. Cobb knew at the time of Lowell's death that something had gone wrong. The court determined that this knowledge triggered the running of the three-year statute of limitations in § 27-2-205(1), MCA. The court opined that the running of the statute of limitations did not require that a lay person understand the exact nature of the malpractice. The court thus concluded that the statute

6

of limitations had begun to run no later than December 15, 2000, the day after Lowell's death.

¶20    The court also rejected Cobb's argument that Dr. Saltiel's absence from Montana tolled the statute of limitations pursuant to § 27-2-402, MCA.  The court looked to M. R. Civ. P. 4D(3).  M. R. Civ. P. 4D(3) provides the same force and effect of service of a summons and complaint outside of Montana as though service had been perfected in Montana.  The court determined that Cobb had a legal mechanism available to serve Dr. Saltiel.  The court further determined that Cobb had failed to raise material facts to show that she could not serve Dr. Saltiel while she was out of Montana and thus had failed to establish that the tolling provision in § 27-2-402, MCA, should apply.  The court concluded that the three-year statute of limitations in § 27-2-205(1), MCA, barred Cobb's claims.  Cobb appeals.

## STANDARD OF REVIEW

¶21    We review de novo a district court's grant of summary judgment based on the same criteria applied by the district court.  *Hopkins v. Superior Metal Workings Systems, L.L.C.*, 2009 MT 48, ¶ 5, 349 Mont. 292, 203 P.3d 803.  The moving party must establish the absence of genuine issues of material fact and entitlement to judgment as a matter of law.  *Hopkins*, ¶ 5.  The opposing party must raise a genuine issue of material fact to defeat the motion.  The opposing party must present material evidence beyond mere conclusory or speculative statements.  *Hopkins*, ¶ 5.

7

**DISCUSSION**

¶22   *Whether Cobb timely filed her malpractice claim against Dr. Saltiel.*

¶23   Cobb puts forth two separate arguments in support of her claim that she timely filed her malpractice action against Dr. Saltiel. Cobb first argues that her filing of a handwritten application with the MMLP on November 5, 2003, tolled the three-year statute of limitations. She further argues that Dr. Saltiel's absence from Montana triggered the tolling provision in § 27-2-402, MCA. She contends that this tolling provision stopped the clock on the running of the three-year statute of limitations until Dr. Saltiel returned to Montana on August 12, 2004. Cobb contends, therefore, that the three-year statute of limitations for medical malpractice actions in § 27-2-205, MCA, allowed her until March 28, 2007, to commence the action against Dr. Saltiel. Cobb argues that she timely filed her action on May 16, 2005.

¶24   Section 27-2-205(1)(2), MCA, provides that an action in tort for injury or death against a physician based upon alleged professional negligence "must be commenced within 3 years after the date of injury." MMLP's receipt of an "application for review" tolls the running of the three-year statute of limitations. Section 27-6-702, MCA. The running of the three-year statute of limitations period begins again 30 days after the panel's final decision. Section 27-6-702, MCA.

¶25   Dr. Saltiel argues that the three-year statute of limitations for medical malpractice claims provided in § 27-2-205, MCA, commenced upon Lowell's death on December 14, 2000. Dr. Saltiel concedes that MMLP proceedings tolled the running of the three-year

8

statute of limitations. Dr. Saltiel argues, however, that Cobb did not file a completed claim with MMLP until April 1, 2004. In that event, Cobb had blown the three-year statute of limitations before she even had reached the MMLP.

¶26 Dr. Saltiel further contends that Cobb failed to file her claim within the three-year statutory period, even assuming for sake of argument, that Cobb's incomplete application tolled the statute of limitations on the date of her first handwritten application with the MMLP on November 5, 2003. The statute of limitations started to run again no later than September 18, 2004, 30 days after the MMLP had issued its decision. Dr. Saltiel argues that tolling on the date of Cobb's first attempted application with MMLP, November 5, 2003, would have left Cobb with only thirty-nine days to file suit after the statute of limitations began to run again on September 18, 2004. Cobb waited nearly seven months before eventually filing her action on May 16, 2005. We agree.

¶27 Cobb's complaint remains time barred even if we accept the tolling based upon her November 5, 2003, incomplete application. By this date, Cobb had used 2 years, 10 months and 21 days of the three-year statute of limitations. Thirty-nine days remained for Cobb to file a timely complaint. Cobb received service of the MMLP's decision no later than August 18, 2004. Section 27-6-702, MCA, allowed Cobb 30 days before the renewed running of the statute of limitations clock. Cobb could have filed a timely action up through October 27, 2004. Cobb instead waited nearly seven months until May 16, 2005, before filing her complaint.

9

¶28 Cobb further argues that Dr. Saltiel's absence from Montana saves her action. Section 27-2-402, MCA, provides that when a cause of action accrues against a person who 1) is out of state, and 2) cannot be served with process, the action may be commenced within the term limited after her return to Montana. The time of defendant's absence should not be counted as part of the time limited for the commencement of the action if the defendant leaves Montana after the cause of action has accrued. Section 27-2-402, MCA.

¶29 The parties agree that Dr. Saltiel moved from Montana in April 2001 and remained in Missouri until August 12, 2004. The parties further agree that Cobb filed a medical malpractice claim after Dr. Saltiel had left Montana. Cobb argues that Dr. Saltiel's absence from Montana satisfied the "out of state" requirement of § 27-2-402, MCA.

¶30 Cobb overlooks the fact, however, that she had means of serving Dr. Saltiel regardless of whether Dr. Saltiel's absence from Montana satisfied the "out of state" requirement of § 27-2-402, MCA. First, the Great Falls Clinic employed Dr. Saltiel at the time of the alleged malpractice. Great Falls Clinic remained opened and operating throughout the entire time that the statute of limitations was running on Cobb's malpractice claim. Cobb simply could have served Dr. Saltiel through the Great Falls Clinic under M. R. Civ. P. 4D(2)(a). *State ex rel. McGhee v. District Ct. of Sixteenth J.D.*, 162 Mont. 31, 34, 508 P.2d 130, 132 (1973).

10

¶31 Cobb also could have served Dr. Saltiel in Missouri pursuant to Montana's "long arm statute." *McGhee*, 162 Mont. at 34, 508 P.2d at 132. M. R. Civ. P. 4D(3) provides for service upon a person outside of Montana. Cobb claims, however, that § 27-6-701, MCA, prevented her from serving Dr. Saltiel before August 13, 2004. Section 27-6-701, MCA, provides that a plaintiff cannot commence a malpractice claim in any court against a health care provider before she applies to the MMLP and the MMLP renders its decision. Cobb argues that this procedural requirement of § 27-6-701, MCA, forestalls application of the provision of the Montana Rules of Civil Procedure regarding service of process until the MMLP has rendered a decision.

¶32 Cobb asserts that Dr. Saltiel's absence from Montana prevented the running of the three-year statute of limitations until the MMLP had issued its decision in August 2004. Cobb argues that only "after an MMLP decision does a court have authorization to effect service of process through the long arm statute." Cobb argues that the District Court lacked authority to effect service of process through the long-arm statute until after an MMLP decision as the MMLP process imposes a "delay of subject matter jurisdiction."

¶33 We rejected a similar claim in *Davis v. State*, 2008 MT 226, 344 Mont. 300, 187 P.3d 654. There the State argued that § 46-21-102, MCA, deprived district courts of subject matter jurisdiction over petitions for post-conviction relief that were filed more than one year after the date that the conviction had become final. We agreed with the U.S. Supreme Court that the one-year statute of limitations in § 46-21-102, MCA, for the filing of a petition for post-conviction relief represented an "inflexible claim-processing

11

rule," rather than a rule that excludes a class of cases from a court's adjudicatory authority, or subject matter jurisdiction. *Davis*, ¶ 13, quoting *Eberhart v. United States*, 546 U.S. 12, 13, 126 S. Ct. 403, 163 L. Ed. 2d 14, 15 (2005).

¶34 We clarified this analysis in *Miller v. Eighteenth Judicial Dist. Court*, 2007 MT 149, ¶¶ 44-46, 337 Mont. 488, 162 P.3d 121. We concluded in *Miller* that a provision requiring the State to notify the defendant of its intent to seek the death penalty within 60 days of the filing of the information "is, necessarily, a categorical time prescription and not a jurisdictional provision." *Miller*, ¶ 46. The State's failure to comply with the 60-day time prescription did not create "a jurisdictional defect" that precluded the State from seeking the death penalty and precluded the district court from imposing the death penalty as a sentence. *Miller*, ¶ 46. The rule simply "assured relief" to a defendant who properly raised it, but it did not compel the same result if the defendant forfeited it. *Miller*, ¶ 46. In other words, the claim processing rules stand in the nature of an affirmative defense. The defense remains available, and most often lethal, to a defendant who timely and properly raises it. *Miller*, ¶ 46. A defendant's failure to raise an affirmative defense waives this defense. *Meadow Lake Estates Homeowners v. Shoemaker*, 2008 MT 41, ¶ 29, 341 Mont. 345, 178 P.3d 81. In neither circumstance, however, does the action, or inaction, of the defendant affect the court's subject matter jurisdiction to hear a case.

¶35 We proceed therefore to analyze whether § 27-2-402, MCA, stopped the clock on the running of the three-year statute of limitations during Dr. Saltiel's absence from

12

Montana. A defendant's presence in Montana at the time of the injury subjects them to the jurisdiction of Montana courts. M. R. Civ. P. 4B(1); *Beedie v. Shelley*, 187 Mont. 556, 561, 610 P.2d 713, 716 (1980). Section 27-2-402, MCA, seeks to prevent a defendant from defeating a plaintiff's claim for relief by leaving the state or by establishing residence in another state. *McGhee*, 162 Mont. at 34, 508 P.2d at 131 (§ 93-2702, R.C.M. (1947), now codified at § 27-2-402, MCA). The exception to this rule applies when a plaintiff may effect service of process by some method, even though the defendant may be absent from the state. The statute of limitations continues to run during the absence under these circumstances. *McGhee*, 162 Mont. at 34, 508 P.2d at 132.

¶36 Dr. Saltiel performed the surgery on Lowell in Montana. Her presence in Montana at the time of the alleged malpractice left her amenable to the jurisdiction of a court in Montana. M. R. Civ. P. 4B(1); *Beedie*, 187 Mont. at 560, 610 P.2d at 716. M. R. Civ. P. 4D(3) provides for service of the summons and complaint on persons outside "with the same force and effect as though service had been made within this state." *Beedie*, 187 Mont. at 559, 610 P.2d at 715.

¶37 The power of § 27-2-402, MCA, to stop the running of the statute of limitations clock arises only when the defendant remains out of state *and* cannot be served with process. *McGhee*, 162 Mont. at 34, 508 P.2d at 132 (§ 93-2702, R.C.M. (1947)), now codified at § 27-2-402, MCA). M. R. Civ. P. 4(B)(1) and 4D(3), taken together, demonstrate that Dr. Saltiel remained at all times subject to the jurisdiction of Montana courts and therefore amenable to service of process. *Beedie*, 187 Mont. at 559, 610 P.2d

13

at 715. The District Court properly barred Cobb's complaint as being filed beyond the statute of limitations.

¶38  Affirmed.

/S/ BRIAN MORRIS

We Concur:

/S/ MIKE McGRATH
/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER

Justice James C. Nelson concurs.

¶39  I concur in the result of the Court's Opinion, with the exception of the manner in which the Court has calculated the running of the statute of limitations at ¶¶ 25-26. It appears from the Court's language that the date a *completed* claim is filed with the Montana Medical Legal Panel (MMLP) has some import. I disagree.

¶40  To recap the dates:

    a. December 13, 2000—Commission of alleged medical malpractice.

    b. November 5, 2003—Cobb files her claim with the MMLP.

    c. August 12, 2004—MMLP convenes and decides claim.

    d. August 18, 2004—MMLP mails its decision to Cobb.

    e. May 16, 2005—Cobb files suit against Salteil.

14

The statute of limitations, § 27-2-205, MCA, began running December 13, 2000. Under the statute, Cobb had three years in which to file suit. The statute is tolled, however, during the time that Cobb's claim was before the MMLP and for 30 days after the MMLP rules. Section 27-6-702, MCA. Thus, Cobb's statute of limitations was tolled from November 5, 2003. At that point in time she was still within the statute of limitations and, without tolling, still had 38 days to file suit. The MMLP ruled August 18, 2004. Adding 30 days to that date, the three-year statute of limitations began to run again on September 17, 2004. Since Cobb had 38 days left in which to file her suit, she had until October 25, 2004. Clearly her complaint filed May 16, 2005, was time-barred by nearly seven months.

¶41 Computing the running of the three-year statute of limitations in this fashion avoids the question of what constitutes a "complete" claim for MMLP purposes along with the inevitable wrangling that question will raise.

¶42 With this caveat, I otherwise concur in the Court's Opinion.


/S/ JAMES C. NELSON

15